UNITED STATES, Appellee

v.

ROCCO J. DeLEO, Corporal, U. S. Army, Appellant

5 USCMA 148, 17 CMR 148

149

150

No. 4194

Decided November 26, 1954

Samuel Nicosia, Esq., Lt Col Herman P. Goebel, Jr., U. S. Army, and 1st Lt Ivan E. Barris, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case is before us on petition, and presents a problem in the law of search and seizure. The accused, DeLeo, was tried by a general court-martial sitting at La Rochelle, France, for forgery, in violation of Article 123, Uniform Code of Military Justice, 50 USC § 717. The single specification alleged that he falsely, and with intent to defraud, endorsed the signature of Andrew D. Binz on fifteen American Express Company, United States dollar travelers checks, in the total amount of $200.00. He pleaded not guilty, but was found guilty as charged, and sentenced to be separated from the service with a bad-conduct discharge, to forfeit all pay and allowances and to be confined at hard labor for one year. The convening authority approved the findings and sentence, and a board of review has affirmed. We granted the accused's petition in order that we might determine the admissibility of certain exhibits which will be described hereafter.

II

The evidence shows that on July 31, 1952, Andrew D. Binz, then an Army First Lieutenant, purchased American Express Company travelers checks, of the value of some $340.00, and at the time placed his name in the upper left hand corner of each check. On August 19, 1952, he left his hotel room in Bordeaux, France, dined at a nearby restaurant, visited a bar, and later strolled about the town. He returned to his lodgings sometime after midnight to discover that his wallet, containing approximately $280.00 in travelers checks, was missing. None of the checks was countersigned at the time of the loss. On August 25, 1952, he submitted a claim for reimbursement and was paid the face amount of the checks by the American Express Company. On November 26, 1952, he executed an affidavit stating that he was the purchaser of the missing checks; that they had not been countersigned by him or with his authorization; and that the counter-signatures appearing thereon were forgeries made without his approval or knowledge. Later he learned that officials of the crime laboratory of the Criminal Investigation Division had concluded that the signatures on the checks were in fact his own. Lieutenant Binz thereupon repaid to the American Express Company the money received from it. His decision in this respect seems to have been influenced in part by his involvement in other difficulties, which ultimately led to his resignation from the Army.

On March 23, 1953, letters rogatory (Commission Rogatoire) were forwarded to the Division Commissioner of Police at Bordeaux by the Examining Magistrate of the La Rochelle District. These letters were dated October 22, 1952, and were signed by a French Examining Magistrate. They purported to constitute judicial process authorizing an investigation, the taking of statements, and the conduct of all searches and seizures necessary for the purpose of determining the truth of a charge of "swindle," which had been brought against one Bruno Di Fazio "and all concerned."

When Di Fazio was arrested by the French police for dealing in counterfeit American money — which presumably constituted one aspect of the "swindle" charge—he implicated the accused as one of the "pushers" of the illegal currency. Because of this information, the accused became a definite suspect in the eyes of the French police. Further —according to an expert on French law —he then fell within the ambit of the mentioned letters rogatory.

In the prosecution of the investigation authorized by the letters, a certain Inspector Lestrade of the French police determined to interview the accused. Since the latter was a member of the Armed Forces of the United States, the Inspector requested that an American investigator be detailed to accompany him during the investigation—and the

**153**

Criminal Investigation Division assigned one of its agents, a warrant officer named Shumock, to accompany Lestrade to Camp Bersol, where the accused was stationed. The latter's commanding officer, one Captain Baker, was then notified of the contemplated investigation of DeLeo. What next transpired is described by the accused as follows:

"On the 25th of March, 1953, I was told by one of the boys in my outfit that I had an appointment with the company commander at 10:00 o'clock the next morning. At 10:00 o'clock the next morning, which was March 26, 1953, I entered the commanding officer's office and the company commander told me to have a seat and he went out and came back with Mr. Shumock and the French inspector and the CID interpreter. Mr. Shumock came over to me, came directly over to me, and told me that I could consider myself under arrest and that the charges which the French had made against me were counterfeit and traffic. . . ."

Accused was then searched by Shumock and found to possess two $5.00 bills in American military scrip. Both bills bore the same number. The accused did not occupy quarters at Camp Bersol, but his automobile was on the post at the time and was searched. Thereafter, the accused, Shumock and Inspector Lestrade went to DeLeo's apartment in Bordeaux, where the accused unlocked the door, and the premises were searched. In the course of the search, the French Inspector examined the contents of a writing kit which was found on accused's bed. After he had completed his investigation, Mr. Shumock observed a slip of paper on top of others folded in the kit. On this he saw written the name "Andrew D. Binz," and instantly recalled having earlier investigated a matter involving a Lieutenant Binz. Further search of the box revealed four additional sheets bearing the lieutenant's name. Shumock pocketed the slips and returned to the Criminal Investigation Division office with the accused.

DeLeo was thereafter released to the French authorities, who questioned him concerning his connection with the counterfeiting activities of Di Fazio. Later—and after proper warning—Mr. Shumock interrogated him with respect to the forgery offense with the commission of which he was later charged. As an investigative tactic, Mr. Shumock requested the accused to explain his possession of the five slips of paper bearing the name of Lieutenant Binz. As a result of this interrogation, the accused signed a statement in which he stated that he knew and understood his rights under Article 31, 50 USC § 602; that a search of his apartment had been made, during which five pieces of paper bearing the name of Andrew D. Binz were confiscated; that during August 1952 he had met a man called Joseph Delenekaitis in Bordeaux; that Delenekaitis exhibited several American Express checks, which he said he had bought at a substantial discount because of their lack of countersignatures; that he wished to cash them; that the accused accompanied Delenekaitis to his room and demonstrated that the checks might be countersigned by means of copying the signatures already appearing thereon while holding the check to a windowpane, and thereafter retracing the signatures; that Delenekaitis solicited the accused to perform the task and offered him 5,000 francs; and that the latter did so and received the agreed payment therefor.

At the trial DeLeo denied furnishing the information contained in the statement, and in addition denied committing the forgery. Against him in evidence at the trial appeared the stipulated testimony of a Government handwriting "expert" who conceded that he had originally believed the countersignatures on the travelers checks to have been executed by Lieutenant Binz himself, but that later he became convinced that instead they were cleverly traced forgeries.[1] Also in the evidence

---

[1] The skill of the Government's handwriting "expert" seems to leave something to be desired. Most questioned document examiners—we are informed —consider artful freehand forgeries to be much more difficult of detection on careful scrutiny than are traced copies of signatures. The perfection attrib-

**154**

received against the accused—and over his vigorous objection—were included (1) the five slips of paper allegedly found in his apartment and (2) the accused's pretrial confession. It is now contended by appellate defense counsel that the sheets were obtained through an unlawful search and seizure on the part of American officials, and that the later confession constituted a fruit of this "poisonous tree."

### III

Of course, if the search with which we are concerned in the case at bar is to be treated exclusively as a French one, it is not essential for the present purpose to inquire how and on what basis it was conducted. It is a well-established rule of Federal law that the Government may use evidence obtained through an illegal search effected by American state or by foreign police—unless Federal agents participated to some recognizable extent therein. United States v. Haywood, 208 F2d 156 (CA 7th Cir); Johnson v. United States, 207 F2d 314 (CA 5th Cir). Cf. United States v. Volante, 4 USCMA 689, 16 CMR 263.

As extending in a different direction, United States v. Byars, 273 US 28, 71 L ed 520, 47 S Ct 277, has been cited to us. There a Federal officer was present during a search conducted by state officials—his presence being attributable apparently to a hope that its accomplishment would reveal some item which might disclose the commission of a Federal offense. The Supreme Court concluded that the products of the search must, for the purposes of Federal prosecution, be treated as if all of the parties to it had been Federal agents.

In our view, a somewhat higher degree of participation by Federal officials must be required in an overseas area, than in one within the continental limits of the United States, as the predi-

cate for a finding that a particular search constituted an American enterprise. It strikes us that, within the United States, the choice posed in the Byars situation is not at all a difficult one. The Federal agent in such a case may either assure himself that the search is conducted under authority which would suffice for a purely Federal inquiry, or he may withdraw entirely from the venture and leave the matter to state investigation. There exists no strong purpose dictating his presence at the search—save the possibility of securing evidence of the commission of a Federal offense. If he is seeking evidence of that nature, it is not unfair to require that he comply with the usual standards for Federal searches, and he should not be permitted to try for an evidentiary windfall through attending a search conducted by state officers. Cf. Lustig v. United States, 338 US 74, 93 L ed 1819, 69 S Ct 1372.

The situation is materially different as we meet it outside the territory of the United States. That is to say, the serviceman, who is under investigation by the police of a foreign nation, is present in that country by reason of military orders. Having sent him there, the United States labors under a duty to protect him—so far as properly can be—with respect to the criminal procedures of that foreign government. As a part of such protection, it has been thought desirable to arrange for the presence of an American representative at the foreign trial of any military person. See, e.g., NATO Status of Forces Agreement, Article VII, 9(g). Keefe v. Dulles, — F2d — (CA DC Cir), September 16, 1954, 23 Law Week 2125. Since pretrial investigation may be as important as that of the trial in the fixing of guilt or innocence, it is also desirable that American agents be present during an investigation by the police of another nation into an offense of which a member of an American military service is suspected. It is not unnatural, therefore, that our Armed

---

uted to the forgery of Binz' signature by the Government witness' stipulated testimony perhaps reflects an unwillingness on his part to admit that he

had been careless in his first inspection of the travelers checks. Compare Osborne, Questioned Documents, 2d ed, 1929, Chapter XIX.

**155**

Forces should seek to encourage close liaison between foreign police and our own military investigators—which the result 'that one of the latter shall be present to assure the fairness of the foreign inquiry involving a suspected American soldier, sailor or airman.

The nature and benefits of such a liaison arrangement are vividly displayed in the instant case. During the course of the trial, Warrant Officer Shumock was asked by an attorney for the accused why he—and not the French authorities—had taken the accused in custody initially. He replied: "For the benefit of liaison between myself and the French police, they will allow me to put him in custody to keep from having to lock the man up in the French jail." And the accused's individual counsel conceded that: '

". . . If he [Shumock] thought he might find something, he could very easily have got permission before he went down there, but he didn't anticipate anything like that and I dare say also, although it is not in evidence, he was going along to protect the military against the French police. It didn't work out that way, but I am sure that is one of the implied reasons for which the Government allows the military to accompany the French police, to protect the rights of American citizens." [Appellate Exhibit 1, page 18.]

In short, American officials in overseas areas have quite generally and properly acted in liaison with agents of the "host" country in connection with the investigation of offenses of which American servicemen are suspected—this for the purpose of assuring that the legitimate interests of the suspect are protected in the conduct of the foreign investigation.

With this in mind, we hesitate to hold too readily that the mere presence of a military investigator during a search by foreign police necessarily renders the proceeding an activity of the United States. Of course—absent treaty obligations to the contrary[2]—the American investigator may elect to wash his hands of the matter and to withdraw from the enterprise. However, the adoption of this choice must in the long run redound to the detriment of American military personnel overseas—for, under it, and in case of difficulty, service people will find themselves alone in the hands of foreign investigators prior to trial, and will be without the benefit of the presence of an experienced countryman, who is able to explain to them unfamiliar procedures, to act as intermediary, and later to furnish to American authorities a disinterested report of the transaction for use in possible subsequent diplomatic representations by this country. See Keefe v. Dulles, supra.

[2] By reason of the NATO Status of Forces Agreement an American investigator overseas is often subject to special duties—which differentiate him from his stateside counterpart. Under Article VII, section 5(a) of the Agreement "The authorities of the receiving and sending States shall assist each other in the arrest of members of a force or civilian component or their dependents in the territory of the receiving State and in handing them over to the authority which is to exercise jurisdiction in accordance with the above provisions." Under section 5(c), "The custody of an accused member of a force or civilian component over whom the receiving State is to exercise jurisdiction shall, if he is in the hands of the sending State, remain with that State until he is charged by the receiving State." With reference to investigations, section 6(a) provides, "The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offences, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offence." We know of no provision of law which establishes a similar relationship between Federal and state investigators within the United States. Consequently a set of facts which in the United States would lead unerringly to the conclusion that a Federal investigator's presence at a search was attributable to a desire to obtain evidence that some Federal offense had been committed would in a foreign country suggest only that he was seeking to assist the local officials as required by the Status of Forces Agreement.

Mindful of these considerations, we suggest that circumstances which would serve to invoke the ▌ principle of the Byars case within the confines of the United States might not at all suffice to demonstrate that a search, primarily conducted by French officials in France, should be treated in law as an American investigative proceeding. Through these spectacles then we must eye the law officer's determination here that the search was legal. When we observe, too, that the enterprise was initiated by Inspector Lestrade, and that the motive for its existence emanated wholly from the French police—with Shumock's presence a no more than incidental element—we cannot doubt that the record is sufficient to sustain the trial court's determination that the search was not an American one. Cf. United States v. Volante, supra. Completely consistent with this view is Shumock's testimony to the effect that Inspector Lestrade had originally investigated the contents of the accused's writing box, and that thereafter—as it lay open on the bed—the former by chance glimpsed a slip of paper containing a signature which appeared to be that of Lieutenant Binz.

## IV

But what if we were to assume the present one to have been an American search? The Fourth Amendment to the Constitution provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Innumerable judicial decisions have announced ▌ that, in general, the search of a dwelling is illegal unless authorized by a warrant which meets the requirements of the Fourth Amendment. A military person's off-post dwelling—located in the United States—likewise may not lawfully be searched without a warrant. United States v. Darby, 2 CMR (AF) 200.

However, the unqualified doctrine that an American warrant must constitute the foundation for ▌ a legal search can scarcely apply outside the United States, its territories and possessions—for no American court is available and empowered to issue warrants overseas. It is also obvious that Mr. Shumock's path would not have been smooth had he sought—solely under the authority of American process—to enter a French dwelling situated in French territory. In light of the palpable overseas inapplicability of the usual requirements of a search warrant issued by a competent American court—and of Rule 41, Federal Rules of Criminal Procedure—Federal courts have consistently refused to invalidate such searches by reason of the want of such authority. In these circumstances the test is simply one of reasonableness. Best v. United States, 184 F2d 131 (CA1st Cir), cert den 340 US 939, 95 L ed 677, 71 S Ct 480; Grewe v. France, 75 F Supp 433 (ED Wis); Richardson v. Zuppann, 81 F Supp 909 (MD Pa), aff'd 174 F2d 829 (CA 3d Cir).

Even as to searches made within the United States, exceptions to the safeguard of a warrant have long been accorded judicial recognition. As the Supreme Court said in United States v. Rabinowitz, 339 US 56, 94 L ed 653, 70 S Ct 430:

". . . It was recognized by the framers of the Constitution that there were reasonable searches for which no warrant was required.

• • • • • •

"It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. . . . The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case."

It is well recognized that a valid search may be effected as an incident to a lawful arrest. United States v. Rabinowitz, supra; Agnello v. United States, 269 US 20, 70 L ed 145, 46 S Ct 4; Weeks v. United States, 232 US 383, 58 L ed 652, 34 S Ct 341. Moreover, certain searches—as of an automobile—may be authorized on probable cause. Carroll v. United States, 267 US 132, 69 L ed 543, 45 S Ct 280. As the Supreme Court has observed in this context:

". . . Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." [Brinegar v. United States, 338 US 160.]

It is axiomatic, of course, that the reasonableness of a search depends on the facts and circumstances of the particular case. Go-Bart Importing Co. v. United States, 282 US 344, 75 L ed 374, 51 S Ct 153. It is also admitted that a more stringent requirement of reasonableness *may* be imposed when the subject of the search is a dwelling, and that what may "constitute probable cause justifying the search of an automobile might be wholly insufficient to authorize the search of one's dwelling place, his castle." Pearson v. United States, 150 F2d 219 (CA 10th Cir); cf. Davis v. United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256.

Thus, with respect to the case at bar, we now approach the "fundamental inquiry" having to do with whether it was reasonable, in the absence of an American warrant, to search the dwelling maintained by the accused away from his military post and on French soil. See United States v. Rhodes, 3 USCMA 73, 11 CMR 73; United States v. Doyle, 1 USCMA 545, 4 CMR 137. We are sure that this search and the resultant seizure were reasonable.

Concerning searches, paragraph 152 of the 1951 Manual for Courts-Martial provides *inter alia:*

"The following searches are among those which are lawful:

. . . . . .

"A search of property which is owned or controlled by the United States and is under the control of an armed force, or of property which is located within a military installation or in a foreign country or in occupied territory and is *owned, used, or occupied by persons subject to military law* or to the law of war, *which search has been authorized by a commanding officer* (including an officer in charge) *having jurisdiction* over the place where the property is situated or, if the property is in a foreign country or in occupied territory, *over personnel subject to military law* or to the law of war in the place where the property is situated." [Emphasis supplied.]

Thus, it appears that a legal search of property may be effected (1) if the property is located in a foreign country, (2) if it is used by a military person, and (3) if the search is authorized by his commanding officer. We consider that such a search would be reasonable within the Fourth Amendment—with the result that there can be no problem of possible inconsistency between the Manual and that Amendment—assuming that the latter is to be accorded extraterritorial effect. Therefore, if—contrary to our holding—there were here no basis in evidence for the law officer's determination that the questioned search was a French one, it would nonetheless have been lawful, if it had been authorized by an appropriate military commander.

By reason of his rationale for upholding the search, the law officer was not required to consider whether it *had* been so authorized—and we, too, find no need to determine the point. However, portions of the reported testimony do distinctly suggest that authority was present.[3] As revealed thereby, Captain

---

[3] AGENT SHUMOCK:
"Q. Mr. Shumock, would you tell us once more what happened at the time you went to Deleo's apartment on the day in question, 26 March, 1953?

Baker, the accused's company commander, summoned him to the orderly room and personally accompanied the investigators when they searched DeLeo's automobile. Moreover, he made no objection whatever when informed of the agent's desire and intention to search DeLeo's lodgings in Bordeaux. It could well be argued that, under these circumstances, the failure of Captain Baker to indicate the slightest opposition to the continuation of a course of action in an earlier portion of which he had participated personally amounted to no less than an authorization by the most obvious implication. Of course, the consent of *an accused* is not to be inferred readily in such a situation; but that of *a commanding officer* to a proposed search involves somewhat different considerations. Certainly, there can be no sensible suggestion that

---

A. You want me to start back at the first again?

* * * * *

"Q. Yes, from the time Mr. Lestrade approached you.

A. On the morning of 26 March 1953, Mr. Lestrade, the inspector for the judiciary police at Bordeaux, France, approached me and requested that I assist him, accompany him and assist him with a search he wanted to make of Cpl. Deleo's possessions, both at Camp Bersol, France, and at his private address, at 156 . . . I still don't remember the name of the street.

* * * * *

"Q. Was it a street in Bordeaux, France?

A. Yes, sir. I accompanied Inspector Lestrade to Camp Bersol where I contacted Capt. Baker, the commanding officer of Deleo, and informed Capt. Baker what the French police had requested, at which time Capt. Baker had Deleo brought to the orderly room where he was taken into custody by myself and the French police inspector. We found out at that time that Cpl. Deleo did not have any bed or lockers at Camp Bersol. The only thing he had there was an automobile which we proceeded to search in the presence of Cpl. Deleo and Capt. Baker. After searching the automobile of Cpl. Deleo, he was taken with myself and Inspector Lestrade and my interpreter and we proceeded to Bordeaux, France, to his apartment which he had rented. Upon arrival at the apartment, Cpl. Deleo let us into his apartment with his keys and we proceeded to search the apartment.

* * * * *

"Q. Now, Capt. Baker was the company commander?

A. He was the company commanding officer.

"Q. Of the accused, is that correct?

A. Yes, sir.

"Q. Did you get permission from him to take the accused to his home on the French economy and search there?

A. I don't remember if Capt. Baker gave me permission in words. I told him what we had come there to do and he made no objection and called Cpl. Deleo to the orderly room for us.

"Q. You and the French immediately took the accused in custody, didn't you?

A. I took him in custody and told him why.

* * * * *

"Q. But you knew you were going into a home?

A. Yes, sir.

"Q. And you didn't bother to get permission directly from his company commander or his post commander?

A. I didn't get spoken permission, but Capt. Baker did not indicate he didn't want it done that way.

"Q. You didn't ask his permission —in your own words, you 'notified him' what you were going to do, isn't that right?

A. Yes, that is correct."

CORPORAL DELEO:

"Q. Tell the court and the Law Officer when you saw him and where, under what circumstances.

A. . . . . Mr. Shumock came over to me, came directly over to me, and told me that I could consider myself under arrest and that the charges which the French had made against me were counterfeit and traffic. He then made me take off my shoes, my jacket, my outer clothing, and he searched me completely. After that, he told Capt. Baker that he would like to search my possessions on camp and then proceed to my private apartment which was at 156 rue St. Catherine in Bordeaux, France. We then went out to the car which I had on post and searched that completely."

Captain Baker acquiesced unwillingly in the French request for a search because of the coercive influence of Mr. Shumock, as to whom he stood in a distinctly superior military position. And there is indeed no reason to assume that Captain Baker would have been more willing to permit a search of the accused's quarters and belongings on an *American* military post at the instance of French officials, than one of quarters located away from that post and in a *French* city. Quite the contrary! The only conceivable deficiency, as we see it, is that the Captain did not authorize the search expressly—that is, in so many words. Yet in this setting the absence of an explicit direction to search would not inevitably require a holding that the search was unauthorized.

V

Pretermitting the question of Captain Baker's possible consent—a consent not relied on by the law officer or by the Government upon appeal—we nevertheless believe that the search was not unreasonable. The unavailability of an American court from which a warrant might be secured serves as one factor tending to justify the course of action taken by Mr. Shumock. Another is the existence of probable cause to accomplish the present search—a circumstance which was given substantial weight by us in another problem of search and seizure. See United States v. Doyle, supra.

Here the probable cause for the search stemmed originally from information supplied Agent Shumock by French officials in Bordeaux to the effect that the accused was suspected of dealing in counterfeit currency. Through them the American agent learned that this suspicion was based not on the usual informer's "tip," but rather on the fact that the accused had been directly implicated as a "pusher" by one who even then was in the custody of French officials awaiting trial for a similar offense. Shumock was further informed that the French officials had received authorization to take DeLeo into custody, and were armed with a warrant—entirely valid under French law—authorizing them to conduct a search of his quarters and effects. This information was relayed to Captain Baker, the accused's commander, who—as we have seen—summoned him to the orderly room. There the accused was almost immediately taken into custody by Agent Shumock.

The accused's person was searched as an incident of his apprehension—and apparently in the presence of his commanding officer. Through this search it was revealed that the former possessed two five-dollar bills (US Military Scrip) with identical numbers—at least one of which presumably was counterfeit. Thus, at this juncture there existed not only probable cause to believe that the accused had committed an offense, but direct evidence that he was engaged in committing one at that very moment.

On the basis of this information, it was decided—not unnaturally—to search the accused's car and his quarters. In addition to their probable cause for this course of action, and their belief that further tools or fruits of his counterfeiting activities were located in the accused's apartment, the searchers were armed with valid French process permitting the search—in the form of letters rogatory. Although these letters differ somewhat from a Federal search warrant, and seem to accord substantially broader powers to the investigator, the fact remains that the accused's apartment *was* situated in French territory, where the letters appear to have constituted the only judicial process available under which search could proceed. This French location of his dwelling was in no sense attributable to an act of the United States—for DeLeo had been assigned quarters at Camp Bersol, a military post, but of his own free choice had elected to reside in Bordeaux. When we consider all of these circumstances in context, we are unwilling to say that the resulting search was unreasonable—even on the premise that the accused's commander had not consented thereto. United States v. Whitler [ACM 4948] 5 CMR 458.

Of course, under such an assumption we would be required to concede that the investigator possessed the alterna-

tive of securing express consent from the soldier's commanding officer. However, just as the Supreme Court in the Rabinowitz case was able to conclude that a search was reasonable although it might have been accomplished under a warrant, we are permitted here to conclude that the present operation was reasonable although explicit consent thereto by the accused's commanding officer could have been sought without difficulty.

## VI

If the search was lawful, then what of the seizure? Of importance in this aspect of the matter is the ██ distinction between merely evidentiary materials on the one hand, and on the other instrumentalities of crime. See United States v. Rhodes, supra; United States v. Marrelli, 4 USCMA 276, 15 CMR 276. In the former case we held that an accused's diary containing a record of certain illegal import transactions conducted by him amounted to a tool of the crime. In the latter we suggested that various checks—signed and uttered by the accused—constituted the very means by which he had committed numerous offenses of "larceny by check."

In the instant case the items seized took the form of five nondescript slips of white writing paper on which was written the name "Andrew D. Binz"—and which were located in the accused's writing case. As appeared subsequently, the accused had pressed certain missing travelers checks to a windowpane and thereafter traced the signature of Andrew D. Binz. Subsequently he had forged certain countersignatures by copying from the tracery to the checks.

An interesting analogy is furnished by Harris v. United States, 331 US 145, 91 L ed 1399, 67 S Ct 1098. There Government agents were engaged in a search for a number of cancelled checks thought to have been used in effecting the forgery of signatures to other checks. Clearly the Supreme Court regarded these cancelled checks as means and instrumentalities in the commission of forgery. See also Zap v. United States, 328 US 624, 90 L ed 1477, 66 S Ct 1277. The slips of paper here—

bearing, as they did, no more than the apparent signature of Andrew D. Binz, who shortly before had complained of this offense—could hardly have been adapted to a purpose other than one of forgery, past or future. Without making sample signatures on such slips—whether freehand or through a process of tracing—it is doubtful that a credible forgery could have been perfected. Those documents, while not contraband, constituted "private papers" of DeLeo only in an extremely loose and undiscriminating sense of the term. Within the thrust of the Harris case—and our own decisions as well—they were subject to seizure.

Some difficulty inheres in the circumstance that the slips of paper in question were not the objects of the original search. As was pointed out in United States v. Doyle, supra: "The Federal courts have frequently condemned general exploratory searches, where the result of such a search is to produce unexpected products of crime." But we added "However, if the search is lawful, officers may seize items relatively apparent, even though the original purpose of the search did not relate to those items." Although the pieces of paper seized here were not contraband or stolen property—like that involved in Doyle—we do not hesitate to say that the rule utilized there is broad enough to embrace the case at hand. Thus, the seizure—like the search—we find to have been reasonable.

It must also be noted that Mr. Shumock did not possess the alternatives which would have been available to him had the investigation taken place within the limits of the United States. He could not here seek a warrant to seize the paper involved—for the reason that no American court was available to issue such an authorization. The letters rogatory in the possession of the French inspector of police would not have justified the seizure under Federal law, and there is no showing that the French courts would have been willing to issue other letters in connection with a purely intramural crime of the American Armed Forces. Should the French authorities have declined to aid him, when he returned thereafter to attempt a sei-

**161**

zure of the papers, Mr. Shumock might well have run into serious difficulty. He would then have been proceeding to accomplish a search on French soil without the aid of local process. Doubtless his status would have been that of a trespasser—perhaps not as to the accused, but certainly as to French Nationals owning property through which he might necessarily have sought ingress. As the accused's testimony reveals, his apartment constituted a part of the dwelling of a person of French nationality. Thus, we believe, these dangers are much more than fanciful. The purpose of the foregoing remarks is to delineate circumstances which appear to us to have a bearing on the reasonableness of the investigator's actions here. Quite clearly—and in many ways—they are not identical with those which would obtain in the United States.

The basic premise of the present approach is that we must not lose sight of the very substantial differences in this context which exist between conditions as they would be found in the United States and those of other areas. Those differences—together with other factors—often render the possibility of crime and the difficulty of law enforcement greater there than here. These phenomena cannot be ignored with safety in determining the reasonableness of searches and seizures. Further—and in practical vein—it may be suggested that, if unrealistic restrictions are to be placed on American investigators abroad, highly undesirable, albeit indirect, consequences are likely to ensue. One possibility is that "host"

countries may become inclined to exercise more widely the extensive concurrent jurisdiction over American troops which, under the NATO Treaty and other agreements, many of them possess —this because they will recognize that the hands of United States authorities are tied. A more remote contingency might even take the form of a reluctance to accept the presence of American forces, because of the inability of our courts to control military personnel adequately and to punish offenders. Cf. United States v. Garcia, 5 USCMA 88, 17 CMR 88.

## VII

On the premise that the search in suit was *unlawful*, it might rationally be concluded in the ordinary case that the confession by the accused was likewise tainted with illegality.[4] But the instant case is distinctly out of the common rut. Here the accused maintained in sworn testimony that he had *not* seen Mr. Shumock discover the incriminating slips in his quarters, and did not know that he had done so. His version runs to the effect that Mr. Shumock drafted a confession of guilt of the present offense—a crime he had never committed—and that he signed without reading because he wished to avoid a French trial for counterfeiting. DeLeo's story is that he was "framed," but that he willingly acquiesced in the plot of the American investigator, Mr. Shumock, because that course was preferred by him to trial by the French authorities. This account is scarcely complimentary to either of the law en-

[4] The Court voices no final holding in this respect. Among cases which would suggest that an illegal search may on occasion invalidate a subsequent confession are: Nueslein v. District of Columbia, 115 F2d 690 (CA DC Cir); United States v. Darby, 2 CMR(AF) 200; cf. Nardone v. United States, 308 US 338, 84 L ed 307, 60 S Ct 266; United States v. Coplon, 185 F2d 629 (CA2d Cir), cert den 342 US 920, 96 L ed 688, 72 S Ct 362; Coplon v. United States, 191 F2d 749 (CA DC Cir), cert den 342 US 926, 96 L ed 690, 72 S Ct 363. Tending perhaps in a different direction is United States v. Monge,

1 USCMA 95, 2 CMR 1. Cf. Milbourn v. State, 212 Ind 161, 8 NE2d 985; United States v. On Lee, 193 F2d 306 (CA2d Cir), affd 343 US 747, 96 L ed 1270, 72 S Ct 967; Manual for Courts-Martial, United States, 1951, paragraph 140a, page 251. Possibly the criterion is whether, in a particular case the confession may be said to have resulted from the evidence unearthed by the illegal search. Furnishing the warning required by Article 31 might then constitute at least one circumstance indicating the interruption of a chain of causation.

forcement agencies involved—but it clearly amounts to a denial by the accused that his confession was in any measure the product of the allegedly unlawful search and seizure. Under the circumstances, we are not disposed to indulge in speculation concerning "poisonous trees" and the fruits thereof, but will accept the accused's own view that the confession was in no way a result of the search.

A general analogy is furnished by the view of the Supreme Court expressed in Walder v. United States, 347 US 62, 98 L ed 503, 74 S Ct 354. There an accused in a drug case testified in his own behalf on direct examination to the effect that at no time had he possessed narcotics. On a previous occasion narcotics had in fact been found in his possession by law enforcement agents. The court there ruled that the evidence of prior possession might lawfully be introduced, despite the fact that information concerning it had been the product of an unlawful search and seizure. The Walder case reveals clearly that an accused's sworn testimony may unlock the door to prosecution evidence which might otherwise be illegal —and thus indirectly serve to deprive him of an advantage he would otherwise enjoy. Cf. United States v. Dodge, 3 USCMA 158, 11 CMR 158. DeLeo simply gambled on his ability to convince the court-martial of the accuracy of his sworn story that the confession amounted to no more than a complete fabrication—acquiesced in by him to forestall the exercise of French jurisdiction. We see no point in granting him a new election at this time.

## VIII

In light of the foregoing, we unhesitatingly affirm the conviction.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

## I

It is not an easy task to oppose, in an adversarial manner, a court opinion which is written principally to reply to the arguments of a dissenter. Par-ticularly is that true when a number of principles are bandied about without being necessary to the conclusion reached, and without a definite position having been taken. In an effort to present the legal principles in proper order, I will first make some brief observations about the majority opinion and then develop specifically my reasons for dissenting. In general, I accept the statement of facts as related by Judge Brosman; but in certain instances I will elaborate more fully on what I believe to be matters of evidentiary importance.

My associates say that the benefits of a liaison arrangement with foreign officials are vividly displayed in the present case. In fact, they are convinced by this record that we should permit wider participation by American police officers in foreign countries than we would permit in America before we find their activities become an American venture. In the light of this record, I wonder how far they are willing to go. All the American Warrant Officer did in this instance was this: He called the company commander and requested that the accused be ordered to report when he and the French official arrived; when the accused appeared, the Warrant Officer placed him under arrest; he searched the accused's person; he searched his car; he accompanied the accused to the latter's home; he assisted in searching through the accused's effects; unbeknown to the French officials, he seized the incriminating evidence, which he alone could identify; and he developed the facts of an unrelated crime in which the French Government had no interest. If his purpose was to protect the accused from foreign prosecution, he filled the role of the wolf who guarded the sheep.

Mention is made in the opinion of the Court about the duty of the Government to protect its servicemen overseas. With that I concur. Also, I agree that it is desirable to have American investigating officers in the Criminal Investigation Division protect their fellow-members from unfair treatment by nationals of other nations. Just as important, however, is that this Court

**163**

protect members of the armed services from abuses which are within its control. This is a case where we, within our own system, can afford a serviceman overseas, and largely at the mercy of the Government, the same protection he can be given within the continental limits of the United States and not deter crime detection one whit. Unfortunately a majority of the Court elects not to do so; and the majority opinion lowers the American standards of searches overseas to those of any foreign government. If that is to be the rule, and I assume the Court so holds, then the soldier's home, if it happens to be in a foreign country, is no longer his castle. Henceforth, and hereafter, it ceases to be secure from searches which would not be countenanced in this land.

It is important that the real issue in this case should not be obscured by glittering generalities, as we are not here concerned with violations of French officials. Neither are we concerned with foreign trials nor with the NATO Status of Forces agreement, which, if of any importance, was not in effect at the time of this search. Reference to them sounds impressive, but unfortunately our problems deals simply with the issue of whether an American military investigator failed to extend to this accused one of the basic rights guaranteed to him by the Code and the Manual. It seems a bit unusual to have the Court so solicitous about protecting an accused from trespass by foreign agents when our concern is this: Is this accused to be protected from a trespass by an American agent?

II

If the record in this litigation established a search authorized by an American officer in authority, █ then the case fades into insignificance and all other discussion of facts and theories is unnecessary. The Court skirts a holding on that theory; but, like some other principles mentioned in the opinion, it is merely suggested as a possible ground for affirmance. The end result is that, after being posed, the question is finally left unanswered as not being necessary to the conclusion reached. Of course, the record is the reason for not making it the basis of the decision. From the time this case was started until my associates advanced the idea, not one lawyer connected with the litigation conceived the thought that the record would support such a finding. The truth of the matter is the Government disavows any such theory.

Before analyzing the testimony in the record on that question, I believe it well to look at the cast of characters and the background in which they were operating. As I understand the Army's assignments of units, and its use of the Criminal Investigation Division, personnel of that Division are under control of the Provost Marshal General of the Army. They are usually attached to, and work under orders from, headquarters of the larger administrative echelons, principally posts, stations, communication zone headquarters, and similar organizations. Certainly in this instance, Warrant Officer Shumock, the principal actor, was taking his orders from someone on a higher administrative level than a company commander and he appeared in this drama in his representative capacity. He was not a member of the command with which we deal, and his actions indicate clearly that the Captain's desires were of no importance. The second character was an official representing the French Government and he was armed with the authority of that Government to search any person, or any place, and seize property of any description. The third character was Captain Baker, who appears to me to be a captive participant; and, of necessity, the last is the accused. As the plot developed, the Warrant Officer was requested by the French official to assist him in uncovering the evidence that the accused was engaged in counterfeiting. Time permitted permission for searches to be obtained from the post commander or other appropriate officer, but they were bypassed and the two investigation officers contacted the Captain. He was told by the American investigator what the French police officer proposed to do. I suppose it is not stretching my imagination to believe that if the Captain

·did not already know who Shumock was, and the headquarters he represented, disclosure was made upon initial contact. The Captain thus found himself confronted by two police officials—one representing France, and one the United States. The American representative requested that the Captain have the accused report, and the request was complied with. Immediately upon reporting, the accused was taken into custody by the two investigating officers and informed by the Warrant Officer that he was under arrest. He was further notified by the Warrant Officer that charges had been preferred against him by the French Government, which incidentally is not supported by the record. If I follow the concepts of my associates correctly, I would surmise that they would hold the Captain authorized those acts. But let us proceed with the story. The accused was searched, his car was searched on post, and I find no testimony in the record that the Captain authorized or directed that those searches be made. The police officers then left the post and the accused's home was searched. It is of importance to note that there is not one iota of testimony in the record that any American commissioned officer, by either words, writing, or affirmative acts, expressly authorized any one of the three searches. Moreover, the record does not show that the Captain participated in searching the man, the car, or the home. The most that can be extracted from the record is that, he may have been present on the first two occasions. After finishing their task on the post, the two officials left, but before leaving they told the Captain what they were going to do. My associates infer that even though he did not expressly authorize the search, Captain Baker made no objection. My reply is that he was not called upon to do so, and the probabilities are that any person in his situation would have silently acquiesced. It is going much further than I am willing to go to hold that an American Captain must tell a French officer he cannot search · under French Letters Rogatory to avoid being charged with authorizing a search. Moreover, if liaison arrangements with the French Government had been made by higher head-quarters, and apparently they had, a junior commander is not required to make an international incident by interfering with those arrangements. In addition, I do not believe it consistent with military doctrine to suggest that a Captain must resist an official representing higher headquarters of the United States Army who is acting within the apparent scope of his authority. To do any one or all of those acts might mean considerable embarrassment to him, and certainly failure to resist cannot amount to a delegation of authority. When much of the verbiage is cleared away, the suggestion of possible authorization merely converts the Captain's failure to intervene into an affirmative act of conferring powers upon other officials. In summation, I cannot charge him with authorizing the acts of the two officials because he failed to object to their performing their duties under apparent authority of their office.

If I have failed to make any point clear, perhaps I should call upon Warrant Officer Shumock to help me. He stated neither the post commander nor the Captain authorized him to make a search. His version is that they told the Captain what they were going to do, not that the Captain told them what they could do. I will requote part of the testimony found in the Court's opinion with a few additions.

"Q. Where did you go, what did you do at that time?
A. . . . We proceeded to Camp Bersol *where I notified Capt. Baker,* Cpl. Deleo's commanding officer, *of what we were going to do.* . . .

. . . . . .

"Q. Were you making a search?
A. No, sir, *I was assisting and accompanying the French police.*
"Q. But you were not making a search?
A. *I was assisting them* and accompanying them.
"Q. But assisting them as a liaison person?
A. *If the evidence had been found on Cpl. Deleo, I would automatically have had to make an investigation.*
"Q. Subsequent?
A. Yes, sir.

**165**

"Q. But you knew you were going into a home?

A. Yes, sir.

"Q. *And you didn't bother to get permission directly from his company commander or his post commander?*

A. *I didn't get spoken permission, but Capt. Baker did not indicate he didn't want it done that way.*

"Q. *You didn't ask his permission —in your own words, you 'notified him' what you were going to do, isn't that right?*

A. *Yes, that is correct."* [Italics supplied.]

While I may stand apart from my associates in my interpretation of the evidence on this issue, I sense the presence of both Government and defending counsel by my side. At the least, I am justified in this belief by the fact that the Government's brief seeks to support the search and seizure on the theory it was not a military undertaking but was entirely a French venture. Had they concluded from their reading of the record that appropriate military authorities had authorized the search, I am certain they would not seek to rely solely on their present arguments. Apparently they had so little faith in the merits of a contention that the facts of this case established an authorized search that they argued contrary thereto. It may be abundantly clear to my associates that authorization was conferred on the two officials, but to me and to many others who have read the record in this case, the evidentiary picture has a different hue.

The suggestion of authority by the Court is difficult to reconcile with the principles we stated in United States v. Volante, 4 USCMA 689, 16 CMR 263. There a steward of an exchange was duly advised of a larceny and the necessity for an immediate search. One of the interested enlisted men asked if he and a second employee should search accused's locker and he was told that they "had better do something about it or it will be your neck." They followed the advice and by a unanimous court, we ruled that there was evidence from which the law officer could find reasonably that the ensuing search was without any official sanction. If a posi-

tive direction to do something about a requested search can be interpreted as not conferring power on a person to search, then I fail to grasp just how utter silence can be considered as giving one the right to proceed. It must be that my associates are advancing another new theory which I will label as general delegation by silence.

III

Being of the opinion that the search was not authorized, it follows that I must determine other issues in the case. I can dispose of the next one in short order.

It was contended, at the time of oral arguments, that the rights and privileges granted to persons ■■■■■■■ subject to military law by the Uniform Code of Military Justice do not follow the flag. The arguments ring hollow. I can assume that the Constitution of the United States has no extraterritorial effect because I need not rely on it. Our armed forces are scattered all over the world; but that makes no difference to a serviceman's military judicial rights because the Uniform Code of Military Justice controls courts-martial wherever they are held, and we interpret and apply that law without regard to venue. When persons subject to military law are tried by courts of our armed forces, we should apply the law equally and not geographically. I stand unequivocally for the proposition ■■■■■■■ osition that an American serviceman's home is entitled to be protected from invasion by other Americans regardless of where it is situated. Accordingly, I turn to the Code and the Manual to determine the issues involved.

The Manual for Courts-Martial, United States, 1951, paragraph 152, pages 287 and 288, provides as follows:

"Evidence is inadmissible against the accused if it was obtained as a result of an unlawful search of his property conducted or instigated by persons acting under authority of the United States. . . ."

The first pertinent issue makes nec-

essary the interpretation of the phrase "conducted or instigated by persons acting under authority of the United States." Here, the search was instigated by persons acting under French authority and not that of the United States. This narrows the point to be decided to an interpretation of the word "conducted" as the implication in the Manual provision is that evidence obtained by an illegal search is admissible in a court-martial trial if the search was not managed or controlled by Federal agents so as to make it a Federal undertaking. This is in accord with the Federal civilian rule, and we have previously stated that, where applicable, we would adopt rules of admissibility generally recognized by civilian courts where they are consistent with established military practice and procedures. United States v. Doyle, 1 USCMA 545, 4 CMR 137.

Because of the unique facts of this case, I consider it worthwhile to develop the pattern of law as it has been constructed by the Federal courts, and then fit this case in its appropriate place. It has been held by the United States Supreme Court that an unlawful search by strangers, resulting in the procurement of evidence subsequently offered at trial, would not render the evidence inadmissible. In Burdeau v. McDowell, 256 US 465, 65 L ed 1048, 41 S Ct 574 (1921), that Court was considering a factual situation where evidence had been obtained by private individuals blasting open a safe and literally stealing private papers. The papers were turned over to the Department of Justice for purposes of prosecution. The court in that instance said:

"In his opinion the District Judge stated that it was the intention of the Department of Justice, through Burdeau and his assistants, to present the books, papers, etc., to the grand jury with a view to having the petitioner indicted for the alleged violation of section 215 of the Criminal Code of the United States, and the court held that the evidence offered by the petitioner showed that the papers had been stolen from him, and that he was entitled to the return of the same. In this connection the District Judge stated that it did not appear that Burdeau, or any official or agent of the United States, or any of the departments, had anything to do with the search of the petitioner's safe, files and desk, or the abstraction therefrom of any of the writings referred to in the petition, and added that 'the order made in this case is not made because of any unlawful act on the part of anybody representing the United States or any of its Departments, but solely upon the ground that the government should not use stolen property for any purpose after demand made for its return.'

• • • • • • •

"The papers having come into the possession of the government without a violation of petitioner's rights by governmental authority, we see no reason why the fact that individuals, unconnected with the government, may have wrongfully taken them, should prevent them from being held for use in prosecuting an offense where the documents are of an incriminatory character."

In Weeks v. United States, 232 US 383, 58 L ed 652, 34 S Ct 341, the Supreme Court held the admission of documents obtained from the home of the defendant by a municipal official not error, while those obtained by Federal officials was on the other side of the admissibility ledger. The city police obtained certain papers and records from the home of the accused without proper authority. These were turned over to Federal prosecuting authorities. A United States marshal, to strengthen the case, returned to the home and, without a warrant, entered and obtained additional records. The Court ruled as indicated in this quotation:

"We therefore reach the conclusion that the letters in question were taken from the house of the accused by an official of the United States, acting under color of his office, in direct violation of the constitutional rights of the defendant; that having made a seasonable application for their re-

turn, which was heard and passed upon by the court, there was involved in the order refusing the application a denial of the constitutional rights of the accused, and that the court should have restored these letters to the accused. In holding them and permitting their use upon the trial, we think prejudicial error was committed. As to the papers and property seized by the policemen, it does not appear that they acted under any claim of Federal authority such as would make the amendment applicable to such unauthorized seizures. The record shows that what they did by way of arrest and search and seizure was done before the finding of the indictment in the Federal court; under what supposed right or authority does not appear. What remedies the defendant may have against them we need not inquire, as the 4th Amendment is not directed to individual misconduct of such officials. Its limitations reach the Federal government and its agencies. Boyd Case, 116 U. S. 616, 29 L. ed. 746, 6 Sup. Ct. Rep. 524, and see Twining v. New Jersey, 211 U. S. 78, 53 L. ed. 97, 29 Sup. Ct. Rep. 14."

Another slightly different principle was announced in Gambino v. United States, 275 US 310, 72 L ed 293, 48 S Ct 137. There New York state troopers searched two persons and their car without probable cause and without a search warrant. The National Prohibition Act, October 28, 1919, 41 Stat 305, Title II, § 2, contemplated some cooperation between the state and Federal Governments in the enforcement of the act. At the time of the search, New York had repealed its prohibition act. The Supreme Court held the officers were not agents of the Federal Government but, nevertheless, the property taken in the seizure was inadmissible. Mr. Justice Brandeis, speaking for the Court, announced this rule:

". . . There is no suggestion that the defendants were committing, at the time of the arrest, search, and seizure, any state offense; or that they had done so in the past; or that the troopers believed that they had. Unless the troopers were authorized to make the arrest, search, and seizure, because they were aiding in the enforcement of a law of the United States, their action would clearly have been wrongful, even if they had had positive knowledge that the defendants were violating the Federal law. No Federal official was present at the search and seizure; and the defendants made no attempt to establish that the particular search and seizure was made in co-operation with Federal officials. But facts of which we take judicial notice (compare Tempel v. United States, 248 U. S. 121, 130, 39 S. Ct. 56, 63 L. Ed. 162), make it clear that the state troopers believed that they were required by law to aid in enforcing the National Prohibition Act; and that they made this arrest, search, and seizure, in the performance of that supposed duty, solely for the purpose of aiding in the Federal prosecution."

The closest case on facts I have been able to find is Byars v. United States, 273 US 28, 71 L ed 520, 47 S Ct 248. After reciting that the warrant used by the state officers was bad if tested by the Fourth Amendment and laws of the United States, the court quotes the testimony of the Federal prohibition agent and a state officer. From this testimony, it is apparent that the Federal official was asked to participate, and did participate, as a Federal enforcement officer, upon the chance, which was subsequently realized, that something would be uncovered of official interest to him as a Federal officer. I quote two excerpts from the opinion:

"While it is true that the *mere* participation in a state search of one who is a federal officer does not render it a federal undertaking, the court must be vigilant to scrutinize the attendant facts with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods. Constitutional provisions for the security of person and property are to be liberally construed, and 'it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.' Boyd v. United States, 116 U. S. 616,

635, 6 S. Ct. 524, 535 (29 L. Ed. 746); Gouled v. United States, 255 U. S. page 304, 41 St. Ct. 261, supra.

". . . We cannot avoid the conclusion that the participation of the agent in the search was under color of his federal office and that the search in substance and effect was a joint operation of the local and federal officers. In that view, so far as this inquiry is concerned, the effect is the same as though he had engaged in the undertaking as one exclusively his own."

Because some question may arise as to whether the entry of Mr. Shumock in the apartment was legal as it is asserted he was there to protect the accused, I refer to the case of Gouled v. United States, 255 US 298, 65 L ed 647, 41 S Ct 261. The facts there were that a private in the Army, attached to the Intelligence Department, was a business acquaintance of one of the defendants. Under the guise of a friendly call, he gained admission to an office maintained by the defendant, seized and carried away certain papers which the Government used to obtain a conviction. We quote from that opinion:

"The prohibition of the Fourth Amendment is against all unreasonable searches and seizures and if for a government officer to obtain entrance to a man's house or office by force or by an illegal threat or show of force, amounting to coercion, and then to search for and seize his private papers would be an unreasonable and therefore a prohibited search and seizure, as it certainly would be, it is impossible to successfully contend that a like search and seizure would be a reasonable one if only admission were obtained by stealth instead of by force or coercion. The security and privacy of the home or office and of the papers of the owner would be as much invaded, and the search and seizure would be as much against his will in the one case as in the other; and it must therefore be regarded as equally in violation of his constitutional rights.

"Without discussing them, we cannot doubt that such decisions as there are in conflict with this conclusion are unsound, and that, whether entrance to the home or office of a person suspected of crime be obtained by a representative of any branch or subdivision of the government of the United States by stealth, or through social acquaintance, or in the guise of a business call, and whether the owner be present or not when he enters, any search and seizure subsequently and secretly made in his absence falls within the scope of the prohibition of the Fourth Amendment, and therefore the answer to the first question must be in the affirmative."

Another facet of the rule may be found in the case of Lustig v. United States, 338 US 74, 93 L ed 1819, 69 S Ct 1372. The Supreme Court of the United States, at page 1374, has this to say:

". . . To differentiate between participation from the beginning of an illegal search and joining it before it had run its course, would be to draw too fine a line in the application of the prohibition of the Fourth Amendment as interpreted in Byars v. United States, 273 US 28, 71 L ed 520, 47 S Ct 248, supra.

"The crux of that doctrine is that a search is a search by a Federal official if he had a hand in it; it is not a search by a Federal official if evidence secured by state authorities is turned over to the Federal authorities on a silver platter. The decisive factor in determining the applicability of the Byars case is the actuality of a share by a Federal official in the total enterprise of securing and selecting evidence by other than sanctioned means. It is immaterial whether a Federal agent originated the idea or joined in it while the search was in progress. So long as he was in it before the object of the search was completely accomplished, he must be deemed to have participated in it. Where there is participation on the part of Federal officers it is not necessary to consider what would be the result if the search

**169**

had been conducted entirely by State officers. Evidence secured through such Federal participation is inadmissible for the same considerations as those which made Weeks v. United States, 232 US 383, 34 S Ct 341, 58 L ed 652, LRA1915B 834, Ann Cas 1915C 1177, the governing principle in Federal prosecutions."

If, as it is contended, the Criminal Investigation Division agent was present for the purpose of protecting the accused because he was an American citizen, then he abused the purpose of his visit. The Government can hardly contend that an entrance under the pretext of shielding a citizen can be converted into an inquisition for his conviction. But more than that, Shumock's testimony discloses definitely that he went along to assist the French authorities in uncovering any evidence against the accused. In his testimony it repeatedly appears that he was assisting in the search, and he disclosed the real purpose of his presence in the apartment when he said, "If the evidence had been found on Cpl. Deleo, I would automatically have had to make an investigation."

I am impressed with the manner in which the rule announced in the Byars and Lustig cases, supra, fits the facts of this case. Here I cannot escape the conclusion that the agent participated upon the chance, which subsequently materialized, that something would be uncovered of official interest to him as a military enforcement officer. He was operating with an understanding that evidence obtained by either himself or the French officer would be used as a base for prosecuting the accused. He arrested the accused and searched his person and automobile. He alone was familiar with the incriminating features of the papers. He personally ransacked the small box for all of the evidence. The French official may have been unaware that the particular property was seized, and this prosecution resulted solely from the personalized activities of the American official. Participation by him under these circumstances can be equated to a venture exclusively his own. There being no evidence in the record which would support a conclusion that the American official was a bystander, or that he was authorized by the appropriate military commander to make the search, I must hold it illegal unless he otherwise was authorized to search.

My associates seek to escape the rules set out in the quoted cases in two ways. First, say they, the law officer found this was not an American venture. In that they err, as he did not so find. He found the French warrant was authority to authorize the search. But, assuming arguendo, he held it was not an American venture, then he is announcing a concept contrary to all Federal authority. Second, I am told a higher degree of participation by Army officials must be required in overseas areas than in the United States before a search becomes an American enterprise. To follow that principle is unnecessarily devastating and the reasons assigned to support it are unconvincing. It is not necessary for a military policeman who goes along to protect his compatriot to turn into a sleuth to convict him. However, if he does, he should be governed by the Code under which American investigators act. Here, Shumock did not protect DeLeo. On the contrary, he went through DeLeo's personal effects with a fine-tooth comb to uncover the evidence to convict. I am for American enforcement officers maintaining liaison with foreign officials, but I am opposed to their use of foreign standards to convict American soldiers. Apparently, my associates in suggesting greater participation by American agents in foreign countries do not wish to distinguish between an American representative's participating to protect an enlisted man and an American detective's participating with the avowed purpose of unearthing evidence to support a prosecution against him. They seem to want to draw the two activities into the same class. I would differentiate between them, both here and abroad, and, if the degree of participation is sufficient to support a finding that it is a Federal venture to obtain evidence in the States, I would make the same finding for the same acts overseas.

170

## IV

At this point I might just as well meet head-on the arguments that Shumock could have relied on the French letters rogatory because they were the standard form used in France; that he could do no better; and that he would encounter difficulty in going in a French home on authorization of a commanding officer only. Assuming they were the standard French form, there is no showing that an American official could not get a warrant which would include the information necessary to meet American standards. So far as I can find in this record no one tried. As to encountering difficulty in going into a French home to search an American's room, that is merely a diversionary argument based on conjecture. The accused accompanied the officers and the landlord had no right to be concerned so long as he was present. The truth of the matter is that Shumock could have operated, and any American investigator in the future can operate, under proper military authorization. Of course that authority can be supplemented, if necessary, by the processes of the foreign government. That would meet the standards of both sovereignties. Certainly, if it is necessary to obtain foreign processes to overcome foreign objections that obstacle would be present with or without authorization. As a matter of fact, all of the suggested obstacles which the majority erect are imaginary straw men erected to confound the issues. In this particular instance precisely the same search could have been made legally, and without complaint by any foreign property owner or government, by the American investigator merely complying with the Manual requirement that he obtain authorization from the appropriate American officer.

## V

The next issue poses an interesting, if not difficult, question. That is: Was the Criminal Investigation ■■■■■■■■ Division agent acting under the authority of a valid search and seizure warrant? The prosecution established without dispute that the warrant possessed by the French official met all the requirements of the French law. However, it is woefully deficient when measured by American standards and I believe the Manual provision dealing with searches speaks in terms of those requirements. The French letters were forwarded to the Division Commissioner of Police at Bordeaux by the Examining Magistrate of La Rochelle district. These letters were dated October 22, 1952, and were signed by the French Examining Magistrate. Translated into English the body of the letters is as follows:

"ROGATORY LETTERS

"I, the undersigned, Pierre DURAND, Examining Magistrate of La Rochelle district,

considering the criminal procedure processed against:

DI FAZIO, Bruno,

and all concerned,

under the charge of swindle,

give rogatory letters to The Division Commissioner of Police, Chief of the 7th Brigade of Judicial Police at Bordeaux, and to any competent examining magistrate

*for the following purposes:*

To investigate thoroughly and in detail the facts referred to in the attached inclosures.

To obtain, under the oath, statements from all useful witnesses and to confront them when necessary.

To carry out any investigation, search and to make any seizure that may be necessary for the establishment of the truth.

La Rochelle, 22 October 1952, The Examining Magistrate

Pierre DURAND

Office of the local
Security Police
Bordeaux 23 oct. 1952
Pol. under No. 8141

Office of M. LUC (Bx)
Examining Magistrate

To be forwarded to the Division Commissioner of Police at Bordeaux, subdelegate for the carrying out of these rogatory letters. Bordeaux, 23 March 1953

**171**

The Examining Magistrate signed: LUC"

The Fourth Amendment to the Constitution of the United States, which, in essence, is adopted by the Manual for Courts-Martial, United States, 1951, provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Rule 41 of the Federal Rules of Criminal Procedure details the specifications for a valid affidavit and warrant, and, in so far as applicable here, it states:

". . . The warrant shall be directed to a civil officer of the United States authorized to enforce or assist in enforcing any law thereof or to a person so authorized by the President of the United States. It shall state the grounds or probable cause for its issuance and the names of the persons whose affidavits have been taken in support thereof. It shall command the officer to search forthwith the person or place named for the property specified. The warrant shall direct that it be served in the daytime, but if the affidavits are positive that the property is on the person or in the place to be searched, the warrant may direct that it be served at any time. It shall designate the district judge or the commissioner to whom it shall be returned."

A cursory reading of the letters rogatory shows that there is no identification of the accused, the premises are not described, the property to be searched unmentioned, and the time of expiration indefinite. The minimum requirements necessary to meet the demands of the Federal law are: That the warrant be obtained from a proper official; that it state the probable cause for its issuance; that it name the persons who have furnished supporting affidavits; and that it state the name of the person or place to be searched, and specify the property to be seized. The letters rogatory fail in every respect and they amount to no more than a roving commission to search any place or person at any time. Such an unlimited grant of authority would not be recognized in any American Federal court and they would be unacceptable to me if acted on in the United States. I fail to observe why it should make any difference in our rule that the letters rogatory were issued in France and comply with French law. When American citizens are tried by American military courts, the Congress of the United States can determine the rules for admissibility of evidence. The authority of the foreign sovereignty is not questioned; it is admitted. The French officials met the standards placed squarely on them, but that is not to say that the American military official did likewise. He certainly did not operate under authority of a warrant sufficient to meet the standards of our law.

I have been unable to find any civilian cases directly dealing with foreign jurisdictions, but there are some statements made in Federal cases, and comments made by text writers, which hold that a warrant which may be valid for state purposes, may be invalid when tested by Federal requirements. In addition, logic and reason dictate that when a Federal official participates to the extent that the search becomes a venture of the United States, he must respect the rights accorded citizens by its Constitution and laws. The theory behind the principle is that the Government should not profit by an illegal act on the part of its officers; and the locale of their operation should be unimportant. If the knowledge is gained as a result of the wrong of its agent, the information obtained by the Government ought not to be used against the party wronged; and the law by which the official's conduct is to be determined must be that of the principal sovereignty. Cornelius, Search and Seizure, § 17, page 62, states the law to be as follows:

"Where a search has been partici-

pated in or instigated by Federal officers, under such circumstances as to stamp it as a joint enterprise . . . the validity of a search and seizure must be tested by Federal law."

In the previously cited Byars case, the evidence was found while executing a search warrant issued by a judge of a State Municipal Court directing search for intoxicating liquors and material used in their manufacture. The information upon which the search warrant was issued stated only that affiant had good reason to believe, and did believe, that defendant had intoxicating liquors in his possession. The Supreme Court there held inferentially that Federal law would apply by including a statement in the opinion to the effect that the warrant clearly was bad when tested by the Fourth Amendment to the Constitution and the laws of the United States.

In Reeve v. Howe, 33 F Supp 619, the District Court of the Eastern District of Pennsylvania was faced with a situation where certain state and Federal officials searched the premises and seized the property belonging to the Communist Party. The court there tested the affidavit and warrant by Federal standards and the following statements are found in the opinion:

". . . The belief that the statements in an affidavit to a warrant are true, is insufficient. Byars v. United States, 273 U. S. 28, 47 S. Ct. 248, 71 L. Ed. 520. The Fourth Amendment of the United States Constitution, provides that: '. . . and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'

"It was also inadequate as tested by the Act of Congress of June 15, 1917, c. 30, title 11, § 3 (18 U. S. C. A. § 613), which provides that: 'A search warrant can not be issued but upon probable cause, supported by affidavit, naming or describing the person and particularly describing the property and the place to be searched.'

"The affidavit being defective, it is unnecessary to consider the alleged defect in the warrant, for if the affidavit was defective, the warrant itself was without lawful foundation. Grau v. United States, 287 U. S. 124, 127, 53 S. Ct. 38, 77 L. Ed. 212. Being so, it is unnecessary to consider whether the warrant was good under the State law, since in no event could such warrant constitute the basis for the search and seizure here which was so palpably a Federal search and seizure."

Applying the foregoing authorities to the facts of this case, I would hold that when a person subject to the Uniform Code of Military Justice searches and seizes under the authority of a search warrant, he must possess a warrant which contains the information and has the specificity required by Federal law. Any other rule permits our officials to trample on the rights of our own servicemen. A search conducted pursuant to a warrant invalid by reason of failure to measure up to Federal standards is not reasonable, and the Government's contention that the evidence is admissible because the activities of Shumock were covered by a lawful search and seizure under French authorization should be overruled.

VI

Because my views require a reversal, it is necessary that I go one step further and determine the admissibility of the confession. If it cannot be relied upon by the Government, then there is insufficient evidence to sustain a finding of guilty of the offense and the case should be dismissed. On the other hand, if the confession is admissible, the error would be limited to the improper introduction of the exhibits and a rehearing should be ordered. A decision on that issue requires a discussion of the rule to be followed in admitting evidence resulting from leads which are unearthed by military officials while conducting an unlawful search and seizure. Here again my associates throw out a general proposition of law but leave the question unanswered. I can only suppose the in-

conclusive dicta is included to soften any arguments without meeting them boldly.

The common law rule was to the effect that the admissibility of evidence was not affected by the legality or the means through which the party was able to obtain it. This is presently the rule in many state jurisdictions, but it has not been followed by the Federal decisions. The general rule in the Federal judiciary is that evidence obtained in violation of constitutional or statutory provisions is inadmissible. In the present instance the application of the Federal rule to the physical evidence obtained by the offending agent offers no problem. I have already announced by my holding that the pieces of paper seized by him were inadmissible. The more difficult question is the admissibility of the incriminating statements later made by the accused. Before dealing with the authorities which have discussed the principle, I mention two important facts peculiar to this case which are not in dispute. First, prior to the unlawful search and seizure, the Government was not in possession of any evidence which pointed to this accused as being suspected of the particular crime. His identity as the perpetrator of the offense, and even any information that an offense had been committed, was first brought to light by the evidence obtained when the Criminal Investigation Division agent was illegally searching his apartment. Second, the search had been discontinued and an appreciable period of time had elapsed before the confession was given by the accused. If, therefore, the confession is to be outlawed, the holding must be founded on the theory that the Government was led to discover evidence of identity by an illegal act of its agent and the accused is immunized from prosecution for the reason that all subsequently uncovered evidence had its source in illegality.

I have found two cases in which courts have considered the particular question herein confronting us. For the most part, generalized statements are set out in other cases and their particular application to the facts of this case forces conflicting results. However, I believe the status of the Federal law persuades a holding that the confession is inadmissible.

The Supreme Court of Indiana in Milbourn v. State, 212 Ind 161, 8 NE2d 985, discussed the question of the admissibility of an incriminating conversation made immediately after an invalid search and seizure. The defendant's contention there was that the confession was obtained under color of the invalid search warrant and the statement was, therefore, incompetent. That court conceded the search and seizure was illegal, but it settled the law in that jurisdiction by holding that a voluntary statement containing an admission of guilt is not the subject of a search or seizure. That decision isolated principles involving compulsory self-incrimination from those concerning unlawful search and seizure and concluded that so long as compulsion did not motivate the statement it was admissible.

The United States Court of Appeals for the District of Columbia in Nueslein v. District of Columbia, 115 F2d 690, reached what appears to be an opposite conclusion. There, police officers entered the home of the defendant and while they were illegally in the premises, he volunteered a statement to the officers connecting him with the offense. The sole question discussed was the admissibility of the statement. The court there considered the protection afforded by both the Fourth and Fifth Amendments to the Constitution and, after discussing policy considerations, held the statement was a product of the unlawful search and, therefore, could not be used by the Government. That court concluded it was more important to protect the right of the people to be secure in their homes, than it was to permit the evidence obtained while carrying out the illegal measure to be admitted against the defendant.

A majority of the United States Court of Appeals, Second Circuit, in United States v. On Lee, 193 F2d 306, under a different factual background, disagreed with the doctrine of the Nueslein case. In that instance the court stated:

"... One Court of Appeals has

174

expressly gone beyond the holding of the Olmstead case. In Nueslein v. District of Columbia, 73 App. D. C. 85, 115 F. 2d 690, police officers entered a suspect's home while conducting an investigation of an automobile accident. When the homeowner appeared he admitted driving the car in question. The police were convinced by his appearance that he was intoxicated and they arrested him on a charge of drunken driving. Because the testimony of the police officers was admitted, the conviction of the accused was reversed. The opinion states, 115 F. 2d at page 692: 'The crucial thing "found" in this "search" was a declaration of fact by the defendant that has become decidedly incriminating.' But we are not disposed to follow the extension adopted by the court in the Nueslein case in view of the clear statement in the Olmstead case that only the taking of tangible things violates the Fourth Amendment. And this is especially so when we are confronted with the facts in the case at bar."

There are a number of Supreme Court cases which skirt the issue but they offer some guideposts, albeit they are not always clearly discernible. That is not to say there is uncertainty concerning property seized during an illegal search. The area of doubt exists in the area of after-acquired evidence. In Nardone v. United States, 308 US 338, 84 L ed 307, 60 S Ct 266, that Court was required to pass on the question of whether section 605 of the Communications Act, 48 Stat 1064, interdicted only the substance of the telephone conversation intercepted or all testimony which became available as a result of the listening. The Court concluded that facts improperly obtained do not become sacred and inaccessible. It went on to explain that, if knowledge of them is gained from independent sources, they may be proved like any others; but knowledge gained from the Government's own wrong cannot be used by it simply because it is used derivatively. That principle poses a problem of how far the original taint may pass down the chain of circumstances and render evidence inadmissible. If it is applied to all evidence whose source can be traced back to the original wrong, then the Government in this case is precluded from proceeding against this accused regardless of the evidence subsequently collected against him. Mr. Justice Frankfurter, who wrote the opinion for the Court, recognized the difficulties presented and he suggested a method of meeting the problem. The opinion stated:

"In practice this generalized statement may conceal concrete complexities. Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. A sensible way of dealing with such a situation—fair to the intendment of § 605, but fair also to the purposes of the criminal law—ought to be within the reach of experienced trial judges. The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisoned tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin."

In United States v. Mitchell, 322 US 65, 88 L ed 1140, 64 S Ct 896, the Supreme Court discussed a variation of the rule previously announced by it in McNabb v. United States, 318 US 332, 87 L ed 819, 63 S Ct 608. In the Mitchell case, the defendant claimed that Federal officers had illegally searched his home and obtained a confession improperly. The issues of fact were resolved against the defendant but the court, in disposing of the litigation, announced the following principles:

" ". . . Under the circumstances of this case, the trial courts were quite right in admitting, for the juries' judgment, the testimony relat-

**175**

ing to Mitchell's oral confessions as well as the property recovered as a result of his consent to a search of his home. As the issues come before us the facts are not in dispute and are quickly told.

• • • • • •

". . . Illegality is illegality, and officers of the law should deem themselves special guardians of the law. But in any event, the illegality of Mitchell's detention does not retroactively change the circumstances under which he made the disclosures. These, we have seen, were not elicited through illegality. Their admission, therefore, would not be use by the Government of the fruits of wrongdoing by its officers. Being relevant, they could be excluded only as a punitive measure against unrelated wrongdoing by the police. Our duty in shaping rules of evidence relates to the propriety of admitting evidence. This power is not to be used as an indirect mode of disciplining misconduct."

Inferentially, I extract from this opinion that had the search and seizure been illegal, the confession would have been the fruit of a wrongdoing and, therefore, inadmissible.

In re Fried, 161 F2d 453, the Court of Appeals, Second Circuit, was confronted with a motion to suppress certain evidence illegally seized. Included in the motion was the suppression of confessions alleged to have been illegally obtained. The procedural question there involved is of no moment as military law does not provide for summary proceedings but the principles promulgated are illuminating. Each of the three judges wrote a separate opinion, but two concurred on the ground that the confessions were obtained in violation of the accused's constitutional rights. The general rule that a confession is inadmissible at the time of trial if Federal officers obtained it by means of a violation of a Federal statute governing their authority was affirmed. Admittedly the decision is not clear-cut because both coercion in violation of the Fifth Amendment and illegal search in violation of the Fourth Amendment

**176**

were involved. However, the opinion deals with both on an equal basis.

In United States v. Coplon, 185 F2d 629, cert den 342 US 920, 96 L ed 688, 72 S Ct 362, the United States Court of Appeals, Second Circuit, gave consideration to excluding disclosures obtained by tapping telephone cables. From this holding we gather that once a forbidden act uncovers incriminating evidence, all other facts subsequently unfolded as the result of the illegality are inadmissible. The rule of that court is announced in the following language:

"The next question is of the 'taps' taken after January 6th. It is of course well-settled law that 'wiretapping' is forbidden by statute; and that evidence obtained by a federal officer in violation of law may not be used against the victim of the violation. In United States v. Goldstein we declared what, as we understood the law, was the consequence of 'wiretapping.' The accused has the burden of proving that the prosecution has in fact 'tapped' his wires; but, if he succeeds in doing so, the burden falls upon the prosecution to prove that the information so gained has not 'led,' directly or indirectly, to the discovery of any of the evidence which it introduces. It is true that on appeal although the Supreme Court affirmed our decision, it was careful not to affirm this ruling, and, as we said in our opinion, it was not an inevitable gloss upon what the court had said in Nardone v. United States. However, we thought then, and we still think, that it best carries out the purpose of the language used, and we shall adhere to it, until we are told that it is wrong. The question in the case at bar is therefore whether the prosecution succeeded in proving that the 'taps' taken between January 6th and March 4th were not necessary to the production of any of the evidence introduced at the trial."

In Coplon v. United States, 191 F2d 749, cert den, 342 US 926, 96 L ed 690, 72 S Ct 363, the United States Court of Appeals for the District of Columbia was considering a case which involved

the same defendant identified in the previous paragraph. That court announced the same principles in the following language:

"Section 605 of the Federal Communications Act, 47 U. S. C. A. § 605, makes inadmissible in federal courts evidence obtained by intercepting either interstate or intrastate telephone communications. Nardone v. United States, 1937, 302 U. S. 379, 58 S. Ct. 275, 82 L. Ed. 314; Weiss v. United States, 1939, 308 U. S. 321, 60 S. Ct. 269, 84 L. Ed. 298. 'Leads' obtained by wiretapping may not be utilized by the prosecution, but the fact that wires were tapped does not vitiate a criminal prosecution if the government can establish to the court's satisfaction that its proof at the trial had an origin independent of wiretapping. Nardone v. United States, 1939, 308 U. S. 338, 60 S. Ct. 266, 84 L. Ed. 307. The pretrial procedure in New York was what has come to be known as a 'Nardone hearing.'"

If I follow the doctrine announced in those Federal cases, the confession with which we deal is inadmissible. There is, however, another facet of the problem which is present in military law but which is absent in civilian law. Under Article 31, Uniform Code of Military Justice, 50 USC § 602, an accused must be informed that he need not make any statement concerning the offense for which he is being investigated. There is no dispute that in this instance the accused was so advised. This poses a question as to whether such a warning cuts off the causal connection between the original illegal act and the giving of the confession. To furnish an answer, it is necessary to weigh the right of the Government to use a derivative confession partly insulated from its tainted source by a warning against the wrong which made its production possible. Both cannot be preserved. Generally speaking, the right of the Government must yield to the right to be secure in a home; but at times the violation of the latter may be so detached from the former that the taint has disappeared. Warning is a factor to be weighed in determining the at-tenuation. In this instance, as a matter of good sense and in spite of the warning, the connection between the confession and the illegal seizure had not become so attenuated as to dissipate the taint. While some time had elapsed, the freshly obtained evidence was spread before the accused and he was directed to explain his possession. The psychological disadvantage of being confronted with illegally obtained documents could hardly be more pronounced. The accused was faced with compelling evidence of guilt and given confusing instructions. He was first told he need make no statement, and an explanation was then demanded. With the fruits of the seizure staring him in the eye and with the possible choice of confessing his crime to his friends, or being further pursued by the French, he was left a difficult choice. Arguments on abstract theories vanish when the poisoned fruit is the bait used to lure the accused to talk. In the instant case, he seized the bait and now the Government asserts it should be the beneficiary of the wrong. Having set the chain of circumstances in motion by an illegal venture, it seems only just that the Government should not profit by the fruits of its wrongdoings.

My holding would immunize this accused from prosecution when the record reflects fairly he committed an offense. But freedom from illegal search of his abode should be guaranteed every person subject to the Code. We have been extremely liberal in permitting military officials in the chain of command to order a search, and there is no justification for any member of the armed forces not being armed with legal authority before he enters a dwelling. When all that is needed to legalize a search is readily available within the armed services, little handicap is placed on them because we apply strictly a rule of evidence. The policy underlying freedom from unlawful searches outweighs the desirability of convicting one whose crime was revealed solely by an unlawful invasion of his home.

## VII

I would reverse the decision of the board of review and dismiss the cause.