UNITED STATES, Appellee

v

EUGENE N. YOUNG, Technical Sergeant,
U. S. Air Force, Appellant

10 USCMA 249, 27 CMR 323

No. 12,175

Decided March 6, 1959

*Lieutenant Colonel Sam F. Carter* and *Captain Norman J. Nelson* were on the brief for Appellant, Accused.

*Lieutenant Colonel Robert W. Michels* and *Captain John W. Fahrney* were on the brief for Appellee, United States.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convicted the accused of forging and uttering a forged check, in violation of Article 123, Uniform Code of Military Justice, 10 USC § 923, and sentenced him to a bad-conduct discharge, total forfeitures, and confinement at hard labor for nine months. Intermediate appellate authorities affirmed the findings of guilty but modified the sentence in several respects. On this appeal, the accused contends that the law officer erred to his prejudice by refusing to allow him to present evidence in an out-of-court hearing to the effect that a pretrial statement made by him was inadmissible in evidence.

The prosecution called a Federal Bureau of Investigation agent to the stand as a witness. Defense counsel advised the law officer that he believed

the witness would testify in regard to a pretrial statement by the accused. Since the defense proposed to contest the admissibility of the statement, he requested that the matter be considered in an out-of-court hearing. The law officer granted the request. Two witnesses were heard on behalf of the Government in the out-of-court hearing. The accused then took the stand. After some testimony, the law officer interrupted. The following discussion was had:

"Law Officer: Let me interrupt just a moment. Do you intend to call witnesses other than the accused on this matter before we call the court? This testimony will have to be heard by the court.

"Defense Counsel: I don't believe it is proper to be heard by the court.

"Law Officer: This would be repe-

250

titious. If this is the only witness that you have, his testimony would concern prejudice to his rights and be in conflict with what we have previously heard. It would be a decision that would ultimately have to come before the court, as to voluntariness, we would have to put him on the stand, as we will have to do with the two previous witnesses for their testimony.

"Defense Counsel: For what purpose?

"Law Officer: Their testimony before the court as to the voluntariness of the statement is essential. It is their decision to make and I feel in fairness to the accused himself he should present his testimony before the court and it would be error for the law officer to rule on the admissibility on his own volition. At this point the accused will rejoin his counsel and court will be called back into session."

The court was reconvened and over defense counsel's objection the hearing on admissibility was conducted in the court members' presence. Briefly, the evidence is as follows: On June 21, 1957, the accused cashed a check at a banking facility on the Luke Air Force Base, Arizona. The check was drawn by "Edmond De Simons" against a non-existent account on a bank in Warren, Ohio. On July 26, 1957, a Federal Bureau of Investigation agent appeared at the Office of Special Investigations at the base. He spoke to agent Mitchum. At his request Mitchum made "arrangements" for the accused to come to the office for questioning. The accused was called at his organization and directed to report "immediately" to the Office of Special Investigations. On arrival there, he was referred to two men. One identified himself as a Federal Bureau of Investigation agent and the other was identified as "Mr. Mitchum of the OSI." With Mitchum sitting "right next" to the accused, the Bureau agent questioned the accused. According to

his testimony, he told the accused he had information about a check issued by the accused on a nonexistent account. He advised the accused he did not have to say anything and that if he did say anything, it could be used against him. He also advised the accused he had a right to counsel. He made no threats or promises and exerted no coercion against the accused. Agent Mitchum took no part in the interrogation. Eventually, the accused made a statement which was reduced to writing by the FBI agent, signed by the accused, and witnessed by agent Mitchum.

The FBI agent was substantially corroborated by Mitchum who explained his presence at the interrogation as follows: "the only reason for my being there was to assist Mr. Tuckey and I did witness a statement." On the other hand, the accused testified that when the introductions were completed, the FBI agent opened a folder and produced a photostatic copy of a check. He held out the check and said "What about this, Sergeant." He was questioned and made an oral statement. When the agent "finished writing up" the statement he remarked to the accused " 'You know your rights under the Constitution', some words to that effect."

In United States v Cates, 9 USCMA 480, 26 CMR 260, we held that it is error to deny the accused's request for a preliminary out-of-court hearing to determine the admissibility of a pretrial statement made by him.[2] See also United States v Carignan, 342 US 36, 38, 72 S Ct 97, 96 L ed 48; United States v Cooper, 2 USCMA 333, 8 CMR 133. The question then is whether an issue of admissibility is presented by the record of trial. If there is none, the accused obviously was not harmed by the failure to hold the preliminary hearing. In our opinion, there is an issue of admissibility.

The accused was told to report to the

[2] It would seem that the law officer here completely disregarded his duty to make the initial determination of admissibility in favor of submitting the issue directly to the court-martial. However, the accused does not challenge the law officer's ruling from that standpoint, and we put the matter aside in our consideration of the case.

Office of Special Investigations located on a military installation. ■ At the office he was confronted by two persons, one of whom was a Federal Bureau of Investigation agent and the other an Office of Special Investigations agent. Although the actual interrogation was conducted by the FBI agent, the OSI agent remained through the proceedings; he also witnessed the statement. According to the accused's testimony, he was not told that the investigation was in connection with a civilian charge. On the basis of this evidence we cannot conclude, as a matter of law, that the interrogation was entirely nonmilitary in nature.[3] If the interrogation is determined factually to be military in nature, the evidence patently raises the question whether the accused was advised before or after the statement of his rights under Article 31 of the Uniform Code. Accordingly, the case comes within our decision in United States v Cates, supra.

The decision of the board of review is reversed. The findings of guilty and the sentence are set aside. A rehearing may be ordered.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

I have no doubt that this case can be brought within the sweep of United States v Cates, 9 USCMA ■ 480, 26 CMR 260, but I am of the opinion that the law officer's technical error was entirely harmless. At the request of the accused, he held an out-of-court hearing and the Government produced testimony showing that the confession was given voluntarily. Thereafter, the accused was sworn as a witness in his own behalf but, when it was made to appear that his testimony on the time of warning would merely conflict with evidence introduced by the Government, the law officer ruled that the hearing would be discontinued and the witnesses would be heard in the presence of court members. The court was then reopened, the Government's evidence was introduced, and the accused testified. It is clear from the record that there was no coercion of or inducement to the accused which resulted in denying him the free choice of remaining silent, and the issue narrowed to the sequence of events. There is no disagreement about the fact that the accused was advised of his privileges under the Fifth Amendment to the Constitution and those rights granted by Article 31, Uni-

---

[3] Cf. United States v DeLeo, 5 USCMA 148, 17 CMR 148. In that case a Criminal Investigation Division agent accompanied a French police officer, acting under letters rogatory issued by the Examining Magistrate of the La-Rochelle District, to the accused's orderly room. There the agent informed the accused that "the French had made [charges] against" him. The charges were described as "counterfeit and traffic." The accused, the CID agent, and the French officer went to the accused's civilian apartment in Bordeaux. A search was made of the room by the French officer. One of the objects searched was a writing kit. When the French official laid aside the kit, the CID agent observed in it a slip of paper with the name "Andrew D. Binz." He recognized the name as one which came up in connection with an earlier case. He picked up the slip and several others like it. These were introduced at the trial over defense counsel's objection on

the ground that they had been obtained in violation of American law of search and seizure. We held that the evidence supported the law officer's ruling on two grounds. First, we pointed out that the law officer could reasonably find from the evidence that the search was not "an activity of the United States." In part we said: "a somewhat higher degree of participation by Federal officials must be required in an overseas area, than in one within the continental limits of the United States, as the predicate for a finding that a particular search constituted an American enterprise." Secondly, we observed that even if the search was an American activity it was lawful since there was probable cause to believe that the accused had committed an offense; the accused's commanding officer authorized the search; and the agents "were armed with valid French process permitting the search." Ibid, page 155, 160.

252

form Code of Military Justice, 10 USC § 831, but there is a conflict in the testimony as to whether that warning was given before or after the accused had signed the confession.

It is apparent from my recitation of the facts that the testimony adduced on the interlocutory question was neither inflammatory nor incriminating. It would not incite hostility, bias, or prejudice on the part of court members as the only matter of substance involved was whether the accused was apprised of his privilege to remain silent. The posture of the evidence made it necessary that the court-martial eventually resolve the conflict in the testimony, and that issue was presented to the members under appropriate instructions. It should be evident from this that any error in not permitting the accused to finish his testimony in camera was merely a formality, for the law officer not only ruled properly on the admissibility of the confession but he instructed the court-martial to disregard it as evidence if they found the advice given to the accused was not timely.

There is yet another reason why this error did not prejudice the accused. In United States v Dial, 9 USCMA 700, 26 CMR 480, we held that persons not subject to the Code need not give the warning required by Article 31, supra. In order to differentiate this case, my associates say that, "If the interrogation is determined factually to be military in nature, the evidence patently raises the question whether the accused was advised before or after the statement of his rights under Article 31 of the Uniform Code." I am willing to accept that test and rely upon the record for my conclusion that the Air Force was merely a conduit through which the Federal Bureau of Investigation made contact with the accused.

With regard to whether accused was told the investigation concerned a civilian charge, in passing I invite attention to the fact that the transcript reflects he was not asked whether he had been so told, and contrary to the negative inference my colleagues apparently draw from the fact no such question was asked at trial, accused's responses to other questions indicate the extent of his knowledge on that score. For example, accused testified his interrogator introduced himself as "of the FBI"; he was aware the man called "the District Attorney's office"; and he was told "The civilian authorities did not wish to press any charges." Brushing aside any controversy as to what the record shows, however, and getting to the core of this contention, I merely observe that it matters not the slightest what accused was or was not told. Even had accused been told the investigation was purely civilian in nature, that fact would make absolutely no difference if the evidence showed in fact that the venture was military. Conversely, falsely advising him that the questions were of interest to the military would not make the enterprise theirs if in fact it was one by and for civilian authorities alone. And, assuredly, the absence of any statement at all to accused as to the nature of the investigation cannot affect the character of the inquiry.

In connection with the part played by the service in this instance, the footnote reference by my colleagues to United States v DeLeo, 5 USCMA 148, 17 CMR 148, is of more than passing interest. In that case, as the footnote indicates, a majority of the Court held that the record was "sufficient to sustain. . . [a] determination that the search was not an American one." DeLeo, supra, at page 157. In order to provide a proper frame of reference for purposes of comparison with the case at bar, a recitation of facts showing more precisely than that of my associates, the extent of active participation by the American warrant officer in DeLeo is helpful. There the Criminal Investigation Division agent accompanied the French police inspector to accused's station. The commanding officer was notified, and the accused was summoned to the orderly room where the military investigator took him into custody. The CID agent searched him and found two counterfeit bills. The agent also searched his automobile. The military official and the inspector then went to his apartment in town where the premises were searched. There the CID agent noticed a slip of paper which

aroused his curiosity, and further search uncovered four additional incriminating sheets. These were seized unbeknown to the civilian official and subsequently were introduced into evidence to establish forgery. Comparing *DeLeo* with the case at bar, if in light of those facts the search, as a matter of law, was not a military venture, then most certainly I for one encounter the gravest difficulty in subscribing to a holding that the instant case rises to that level. I am not unmindful, in making the foregoing statement, that the setting of *DeLeo* was in France nor of the Court's observation that they would require "a somewhat higher degree" of participation by the military in overseas areas. I can only observe that the instant case would seem to demonstrate forcefully just how great that "somewhat higher degree" is.

Be the foregoing matters as they may, looking to the record in the instant case I find absolutely no evidence which remotely suggests that this interrogation had its genesis with the military, that the Federal Bureau of Investigation was its agent, that some scheme was developed to escape the provision of the Code, that the agent of the Office of Special Investigations took any part in the interrogation or obtained any statement from the accused, or that the Air Force is seeking to use evidence wrongfully obtained by one of its members. I quote the testimony of the FBI agent to support my conclusion:

"DIRECT EXAMINATION

"Questions by the trial counsel:

. . . . . .

"Q. I see. Where did you have this conversation?
"A. In the office of the Office of Special Investigators, investigated at Luke Air Force Base.
"Q. Mr. Tuckey, who was present other than yourself?
"A. The accused and Mr. Dale Mitchum, a Special Agent of OSI.

. . . . . .

"Q. I see. Now, before we go into this any further, what part did Mr. Mitchum play as a witness or as a party to this procedure?

"A. He was just a witness at my request.

. . . . . .

"Q. What for, what agency were you making the investigation for?
"A. For the Justice Department.
"Q. Were you making it for the Air Force in any way, sir?
"A. No, sir.
"Q. I see. What part did Mr. Mitchum play, if any, in the questioning of the witness?
"A. None.
"Q. He didn't. What did he do then?
"A. He sat right next to us while I was talking to the accused and at the completion of the statement he signed it as a witness.
"Q. I see.
"A. I might add that he had made arrangements for the accused to come to the office. I mean he just went through military channels on having him come to the OSI Office.
"Q. At whose request?
"A. At mine.

. . . . . .

"CROSS-EXAMINATION

"Questions by the individual Counsel:

"Q. Mr. Tuckey, I have a few questions I would like to ask you. You are with the FBI, is that correct?
"A. Yes, sir.
"Q. Uh huh. Now, for what purpose did you come out here to Luke Air Force Base on this day in question you are talking about?
"A. July 25th, 1957?
"Q. Yes.
"A. To talk to the accused about a check which had been sent in interstate commerce for a possible violation of the inter-state transportation statute.
"Q. How did this possible violation come to your attention?
"A. From another one of our offices. I believe it was our Chicago office.
"Q. And you were sent out here to investigate that fact, is that correct?
"A. Yes, sir, the case was assigned to me by my superior.
"Q. Now, where did you go when

you first came on Luke Air Force Base.

"A. To the Office of Special Investigations.

"Q. And did you have a conversation with Dale Mitchum, the Special Agent there?

"A. Yes.

"Q. And what did you say to Mr. Mitchum?

"A. I asked him if there were an airman on the base by the name of Eugene Nickolas Young. His answer yes [sic] 'yes'. I said, 'I wonder if you can arrange for him to come to your office for me to talk with him'. I explained to him about the check in question and he said, 'Fine, I will see if I can get hold of him' or something similar to that. It wasn't long until the accused appeared at the office.

. . . . . .

"Q. In substance. Didn't Mr. Mitchum request a copy of this statement from you?

"A. No, sir.

"Q. You didn't give a copy of this statement to Mr. Mitchum?

"A. We gave the OSI a copy of my report.

"Q. Of your report?

"A. Yes.

"Q. Did that report include the statement?

"A. It did.

"Q. And was it at Mr. Mitchum's request that you furnish him with the statement?

"A. No, sir, that is just our rule.

. . . . . .

"REDIRECT EXAMINATION

"Questions by the trial counsel:

"Q. First of all, Mr. Tuckey, at what time did the OSI make a request for this report?

"A. OSI did not make a request for the report.

. . . . . .

"Q. I see. Now, I want to get this one point again straight. When you came out here was there any request by the military that you make this investigation?

. . . . . .

[Colloquy on objection to question.]

"A. None.

"Q. And again, what was the sole purpose of the investigation?

"A. In connection with a check charge.

"Q. For the agency I am talking about?

"A. Oh, for the agency. United States Department of Justice."

These facts are undisputed, and on the basis of the quoted evidence, I conclude that, as a matter of law, no issue was raised as to this interrogation being military in nature. Accordingly, I would affirm the decision of the board of review.